**CONTINUATION OF APPLICATION FOR SEARCH WARRANT**

I, Ryan McCormick, being first duly sworn, hereby depose and state as follows:

**I.      Introduction**

1.      I am a Special Agent with the Drug Enforcement Administration ("DEA") and have been since 2006.  During my employment with the DEA, I have been assigned to the Detroit Field Division in Detroit, Michigan and the Vienna Country Office in Vienna, Austria.

2.      I have been involved in the investigation of various individuals and organizations involved in the manufacturing, distribution, and use of controlled substances. I have conducted surveillance operations and have become familiar with the methods used by individuals engaged in the manufacturing, trafficking, and use of controlled substances. I received specialized training at the DEA Training Academy in Quantico, Virginia relating to the identification of narcotic substances and the operation of money laundering and drug trafficking organizations. I have written and conducted numerous search warrants which have resulted in the seizure of large amounts of narcotics and narcotics proceeds.

3.      During my employment with DEA, I have participated in the preparation of affidavits in support of numerous search and arrest warrants for violations of federal drug laws contained in Title 21, United States Code, as well as in the execution of the same.

4.      I have further conducted surveillance operations of drug traffickers and have interviewed numerous persons personally involved in drugtrafficking. I have

also supervised numerous confidential sources during the course of carrying out drug trafficking investigations. Through this training and experience, I have become familiar with, and have gained a thorough understanding of the methods, manner and means used by individuals engaged in the unlawful manufacturing, trafficking, and use of controlled substances.

5.      I am personally involved in the investigation of the offenses referred to below. In addition to my personal knowledge, the statements contained in this continuation are based in part on:

a.      information provided by Special Agents with the DEA, state, and local law enforcement officers with the Michigan State Police (MSP), MSP-sponsored multijurisdictional drug enforcement teams Kent Area Narcotics Enforcement Team (KANET) and West Michigan Enforcement Team – South (WEMET), and other law enforcement officials, including oral and written reports that I have received directly or indirectly from DEA and other law enforcement officials;

b.      interviews by investigators with confidential sources and cooperating witnesses;

c.      results of physical and technical surveillance conducted by law enforcement officers, which have been reported to me;

d.      a review and analysis by other law enforcement officers and law enforcement analysts of telephone toll records and subscriber information, which has been communicated to me;

2

e.  telephone calls and messages that were consensually recorded in the course of the investigation, the contents of which I have reviewed or have been reported to me;

f.  phone location information; and

g.  my training and experience as a DEA SA; and the training and experience of other DEA agents and other law enforcement officers with whom I have spoken regarding this investigation, or whose reports I have reviewed.

6.  Because this Continuation is for the limited purpose of establishing probable cause to support the issuance of search warrant against the proposed subject premises, it contains only a summary of relevant facts.  I have not included each and every fact known to me or to other law enforcement officers concerning the entities, individuals, and events described in this Continuation.  This Continuation is made for the purpose of establishing probable cause in support of search warrant for the residence at 500 Coit Avenue Northeast, Apartment 305, Grand Rapids, Michigan (**Subject Premises**) as described in Attachment A for evidence of the commission of the crimes of conspiracy to distribute and possess with the intent to distribute controlled substances in violation of Title 21, United States Code, Section 846; and possession of controlled substances with the intent to distribute them and distribution of controlled substances, in violation of Title 21, United States Code, Section 841(a)(1) as described in Attachment B.

7.      The facts alleged in this continuation are largely encompassed in the continuation in support of the criminal complaint seeking arrest warrants for Anthony Martell SANDERS a/k/a "Money," "Big Money," "Money G," "Pooh," and his brother, Amon Sudan SANDERS OUTLAW a/k/a "Baby Money," and other warrants. *See United States v. Sanders et al.,* no. 1:23-mj-00133, R.1-1: Continuation, PageID.2-54 (the "Complaint Continuation").  I incorporate the factual allegations contained in the Complaint Continuation by reference herein.  A copy of the Complaint Continuation will be provided to the Court upon its request.

8.      Anthony Martell SANDERS a/k/a "Money," "Big Money," "Money G," "Pooh," is a 29-year-old Grand Rapids, Michigan resident who is currently on federal supervised release out of the United States District Court for the Western District of Michigan arising from a 2017 conviction for felon in possession of a firearm. SANDERS currently has an active arrest warrant for violation of federal supervised release. No. 1-16-cr-00177-RJJ.   Before his federal conviction, SANDERS was convicted in 2011 of felony assault with intent to do great bodily harm less than murder and of felony carrying a concealed weapon, and in 2014 of felony-tampering with electronic monitoring device.  As described below, investigators have been able to attribute cellular telephone with the call number (616) 304-0473 used by SANDERS (Sanders Phone 1) to SANDERS in a variety of ways, most notably by the voice recognition performed by the United States Probation Officer currently supervising SANDERS from the recording of a consensually monitored phone call

4

between SANDERS, using Sanders Phone 1, and the UC, discussing narcotics purchases.

## I.   Execution of Arrest Warrant

9.      On April 4, 2023, law enforcement with the DEA and other law enforcement agencies sought to execute an arrest warrant of SANDERS.  Through location information derived from federal search warrants for location information, investigators learned that SANDERS was in the vicinity of **Subject Premises**. Records received from the property management company for **Subject Premises** show that **Subject Premises** is an apartment leased to Laticia Martinez for a business, Commercial Creators.  Public internet searches show that **Subject Premises** is currently being offered for short-term rent through the travel company, AirBnB.

10.     In addition to the location information showing SANDERS in the vicinity of **Subject Premises**, on April 4, 2023, investigators contacted a human source of information (SOI) who had access to the apartment building in which **Subject Premises** is located.  The SOI is not suspected to be involved in criminal activity and was deemed by investigators to be credible and reliable.  The SOI looked at a Secretary of State photograph of SANDERS and stated that he/she believed that he was staying in **Subject Premises.**  Based on my training, experience, and familiarity with the investigation, I believe that, on April 4, 2023, SANDERS was renting and residing at **Subject Premises** through AirBnB.

11.     On April 4, 2023, investigators knocked and announced the existence of an arrest warrant at **Subject Premises**, made entry, and took SANDERS into custody.  Investigators performed a protective sweep of **Subject Premises** and did not see any other individual in **Subject Premises**.  In conducting the protective sweep, in plain sight, investigators saw bulk U.S. currency, rubber latex gloves, and suspected marijuana, a Schedule I controlled substance illegal under federal law.  A photograph of the items visible in plain sight are provided below:



Based on my training, experience, and familiarity with the investigation, I know that drug traffickers often use latex gloves when handling narcotics.  Moreover, this item is also inconsistent with a short-term renter of an apartment for legitimate purposes.

6

I also know that drug traffickers often use cash to conduct drug transactions as to not create a financial trail.  Finally, I know that marijuana is a Schedule I controlled substance illegal under federal law.

12.    I also know from training and experience that subjects involved in drug trafficking often use their residences and vehicles to store drugs and otherwise further their drug trafficking.  Drug traffickers frequently maintain quantities of drugs in their places of residence and vehicles, along with packaging materials, scales for weighing drugs, and rubber or latex gloves to prevent the transfer of fingerprints and/or the contamination of drugs.  Subjects also tend to keep currency, i.e., the proceeds of drug trafficking, and ledgers, notebooks, and other documentation whereby they track their purchases and sales of controlled substances.  In addition to hard copy documents, drug traffickers often maintain records of their activities on electronic equipment such as computers and "tablet" mobile computing devices. Many, if not most, financial institutions now provide software applications ("apps") to their customers which permit the rapid movement of funds between and among financial accounts.  Drug traffickers who move money through financial institutions to buy and sell drugs now may do so using home computers and tablet devices.

2.    I also know from training and experience that drug traffickers frequently utilize mobile telephones to facilitate drug transactions and often have mobile phones with them at their residence or in their vehicles.  Drug traffickers rely upon voice phone services, SMS and MMS text messaging, social media instant messaging services, and electronic mail apps to communicate with suppliers,

customers, and confederates.   Mobile telephones are portable and phone providers often do not require purchasers or users of the devices to provide their true names and/or addresses, so drug traffickers often maintain multiple devices to avoid detection by law enforcement.   Mobile phones often contain evidence indicative of drug trafficking, including records of incoming and outgoing calls; text messages; photographs of drugs, co-conspirators, or currency; and, in the case of "smart phones," Global Positioning System ("GPS") data indicating the location of the device at given points in time.

13.    Lastly, to protect against theft, drug traffickers frequently keep firearms and ammunition on or about premises where they store drugs, currency, or other items of value.  Because drug traffickers cannot report the theft of drugs, drug proceeds, or other items of value to law enforcement without substantial risk of their illicit activities being discovered, they themselves must "police" areas where drugs are bought, sold, and stored through the possession and use of firearms and other dangerous weapons.

14.    Further, based upon my training, experience, and participation in financial investigative aspects involving large amounts of controlled substances, I am aware of the following:

    a.    Drug traffickers often purchase or title their assets in fictitious names, aliases or the names of relatives, associates or business entities to avoid detection of these assets by government agencies.

b.      Even though these assets are in names other than the drug traffickers, the traffickers actually own and continue to use these assets, and exercise dominion and control over them.

c.      Drug traffickers often maintain, on hand, large amounts of currency in order to maintain and finance their on-going drug business.

d.      It is common for drug traffickers to maintain books, records, receipts, notes, ledgers, and receipts relating to the purchase of financial instruments and/or the transfer of funds, and other papers relating to the transportation, ordering, sale, and distribution of controlled substances.   These books, records, receipts, notes, and ledgers, are maintained where the traffickers have ready access to them, including their residences and vehicles.

e.      It is common for drug traffickers to secrete contraband, proceeds and records of drug transactions in secure locations within their residences, businesses, vehicles, or other locations which they maintain dominion and control over to ensure ready access to these items and to conceal them from law enforcement authorities; subjects involved in drug trafficking often have unexplained wealth and assets as they do not have jobs, nor do they report income on their state or federal tax returns. Subjects often use cash, money orders, cashier's checks, and prepaid debit cards as a way of purchasing items as a way to disguise where the funds are ultimately coming from.   Subjects will place assets in the

9

names of nominees, which are often friends and family members in an attempt to hide the true ownership of the assets.

f.      In order to accomplish this concealment, drug traffickers have built "stash" places within their residences, businesses, or vehicles for these items.

g.      It is common for persons involved in drug trafficking to maintain evidence pertaining to their obtaining, secreting, transfer, concealment and or expenditure of drug proceeds.  This evidence includes currency, financial instruments, precious metals and gemstones, jewelry, books, records, invoices, receipts, records of real estate transactions, bank statements and related records, passbooks, money drafts, letters of credit, money orders, bank drafts, cashier's checks, bank checks, safe deposit box receipts or keys, records concerning storage lockers and money wrappers.  These and other items are maintained by the drug traffickers within their residences, businesses, vehicles, or other locations over which they maintain dominion and control.

h.      Drug traffickers often utilize electronic equipment such as computers, and currency counting machines to generate, transfer, count, record, and store the information.

i.      Drug traffickers also utilize electronic equipment such as computers, tablets, and mobile telephones to utilize messaging apps.

j.      When drug traffickers amass large proceeds from the sale of controlled substances that the drug traffickers attempt to legitimize these profits through money laundering activities.  To accomplish these goals, drug traffickers utilize but are not limited to, domestic and international banks and their attendant services, professionals such as attorneys and accountants, casinos, and other gambling activities, real estate, shell corporations and business fronts, storage lockers, safe deposit boxes, and otherwise legitimate businesses that generate large quantities of currency.

k.      The sale of controlled substances generates large quantities of currency in small denominations (commonly referred to as "street money").

l.      It is common for drug traffickers to separate their "street money" by denomination and organize this currency in rubber banded stacks in varying $1,000 increments to facilitate quick counting.

m.      Small and medium denominations of questionable currency, along with the manner in which the currency is handled, carried, and concealed may establish probable cause that there is a substantial connection between the questionable currency and drug transactions.

n.      Drug traffickers at times become fearful that their extravagant spending habits will bring them under scrutiny from the Internal Revenue Service or other federal, state, or local agencies.  The "source" of their income reported on tax returns can be falsely stated, misleading,

11

or generic in terms.  Copies of these returns are commonly kept by the traffickers in their residences and businesses.

o.      Drug traffickers commonly maintain addresses or telephone numbers in books or papers which reflect names, addresses, and telephone numbers of their associates in the trafficking organization.

p.      Drug traffickers take or cause to be taken photographs of themselves, their associates, their property, and their product, and they keep these photographs in their possession.

q.      Unexplained wealth is probative evidence of crimes motivated by greed, including trafficking in controlled substances.

## II.   Conclusion

15.     Based on the foregoing, I respectfully submit there is probable cause to believe that Anthony Martell SANDERS a/k/a "Money," "Big Money," "Money G," "Pooh," has conspired with Amon Sudan SANDERS OUTLAW a/k/a "Baby Money" and and others known and unknown, to knowingly and intentionally distribute controlled substances in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C) and 846.  I further submit that evidence, contraband, fruits of the crime, and instrumentalities of the conspiracy are located at the **Subject Premises** (described in Attachment A), and I therefore request a search warrant for that residence for the items described in each respective Attachment B.